**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**OLAJUWON SMITH,**                                                    **PETITIONER**
**ADC #156184**

**V.**                          **CASE NO. 5:16-CV-66-DPM-BD**

**DEXTER PAYNE, Director,**
**Arkansas Division of Correction[1]**                          **RESPONDENT**

### RECOMMENDED DISPOSITION

**I.**    **Procedure for Filing Objections:**

This Recommended Disposition (Recommendation) has been sent to Chief Judge

D.P. Marshall Jr. Either party to this lawsuit may file written objections with the Clerk of

Court within 14 days. Objections should be specific and should include the factual or

legal basis for the objection.

Parties who do not file objections may lose the right to appeal questions of fact.

And, if no objections are filed, Judge Marshall can adopt this Recommendation without

independently reviewing the record.

**II.**    **Disposition:**

On October 29, 2013, a jury was empaneled and trial began in Benton County,

Arkansas, in Petitioner Olajuwon Smith's criminal trial. Following a short recess, Mr.

---

[1] Since this case began, Dexter Payne has succeeded Wendy Kelley as Director, and that agency has been renamed the Arkansas Division of Correction. See ARK. CODE ANN. § 25-43-402(a)(5) (Supp. 2019); FED. R. CIV. P. 25(d). Accordingly, the Clerk is directed to update the docket sheet to reflect Mr. Smith's current custodian.

Smith changed his plea and unconditionally pleaded guilty[2] to eight felony charges

arising from two separate cases. Per his plea agreement, Mr. Smith was sentenced to an

aggregate term of 40-years' imprisonment in the Arkansas Department of Correction

(ADC), to be followed by 10 years' suspended imposition of sentence. (Docket entry

#40-2 at 209-22)

Mr. Smith timely sought federal habeas corpus relief. (#2) The Court appointed

counsel[3] (#19) and entered a stay so that Mr. Smith could exhaust his state court

remedies. (#22, #23) Once state remedies were exhausted, counsel for Mr. Smith filed an

amended (#34-1, #35) and a second-amended petition for habeas relief. (#65, #66)

In his petitions, Mr. Smith contends that the trial court's ruling that he be shackled

with a stun belt[4] at trial was unjustified and caused him to abandon his jury trial demand

and enter a coerced guilty plea. (#34-1 at 9-21) Mr. Smith also challenges the validity of

---

[2] Criminal defendants who enter unconditional guilty pleas have no right to a direct
appeal. Ark. R. App. P.–Crim. 1(a).

[3] The Court would like to thank Mr. Craig Lambert for taking the appointment and
compliment him on his thorough representation of Mr. Smith as his federal habeas
counsel.

[4] "[A] stun belt [a.k.a. kidney belt] is a restraining device that is placed around an
individual's waist as an alternative to leg-irons or shackles. The battery-powered belt has
two prongs that are placed over the wearer's kidney region. A court bailiff or other law-
enforcement officer can activate the belt by a remote control and, once activated, it sends
a shock to the wearer that cannot be stopped. The electrical shock travels through the
body via blood channels and nerve pathways. The shock knocks down most people,
incapacitates them for up to 45 minutes, and causes them to shake uncontrollably. The
individual may also have uncontrollable defecation and urination, irregular heartbeats,
seizures, and welts, due to the shock." *Wrinkles v. Buss*, 537 F.3d 804, 809 (7th Cir.
2008); see also (#69 at 78-83).

his plea based on his trial counsel's alleged unconstitutional conflict of interest. Further, Mr. Smith claims that his trial counsel was constitutionally ineffective by failing to object to the use of the stun belt (#34-1 at 21-23, #66); by advising him to plead guilty despite a meritorious speedy trial claim (*Id*. at 23-35); by failing to properly challenge the legality of both the search and arrest warrants (*Id*. at 35-45); and by failing to argue that the State tampered with, destroyed, withheld, and presented false evidence in violation of federal law. (*Id*. at 46-50)

In response to the petitions, Director Payne asserts that this Court should give due deference to the Arkansas Supreme Court's determination that Mr. Smith's guilty plea was not coerced and that his ineffective-assistance-of-counsel claims are procedurally defaulted. (#9, #40, #72) Director Payne further argues that Mr. Smith's procedural default cannot be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012) and that, even if it could be excused, his claims—including the most recent conflict-of-counsel claim—lack merit. (*Id*.) Anticipating Director Payne's procedural-default defense, Mr. Smith reserved the right to address procedural default in a reply brief. (#34-1 at 51) Reply briefs have since been filed. (#73, #74, #76)

## III.  <u>Background</u>:

A.     Pretrial

By criminal information filed on August 20, 2008, Olajuwon Smith was charged in Benton County, Arkansas, (CR-08-1239) with eight felony drug and firearm charges,

five of which were Class Y[5] felonies. The charges arose after a series of controlled drug sales Mr. Smith made to a confidential informant and the subsequent warranted search of Mr. Smith's home.[6] (#40-2 at 24-30) Over the course of the next five years, Mr. Smith's representation changed five times and included both retained and appointed counsel. The substitution of counsel resulted in numerous continuances. (*Id.* at 73, 78, 100, 108, 114, 151, 164, 172, 175)

Meanwhile, Mr. Smith remained free on bond until shortly before trial, when he was arrested and charged with aggravated robbery (CR-13-1525), a Class Y felony. As a result of the new charge, the trial court revoked Mr. Smith's pretrial release. (#40-2 at 190-94, 198, #40-8)

Before trial began, Mr. Smith unsuccessfully moved to suppress evidence seized from his apartment, by asserting that the warrant was constitutionally defective and challenging the veracity of the affiant. (#40-2 at 81-83, 140-47, 158, #40-3 at 133-167) Thereafter, the parties stipulated to the propriety of the chain of custody and to the contents of the State's evidence seized in the controlled drug buys and the search of Mr. Smith's apartment. (#40-2 at 188-89, #40-3 at 220) The evidence included various quantities of cocaine and marijuana, two handguns, ammunition, large amounts of cash, and drug paraphernalia. (*Id.*)

---

[5] Each Class Y felony carries a sentence of 10-40 years or life imprisonment. ARK. CODE ANN. § 5-4-401(a)(1).

[6] An amended information was filed on October 28, 2013, reducing the charges to seven felonies, five of which remained Class Y. (#40-2 at 14-18)

The record is silent as to Mr. Smith's courtroom demeanor for over four years preceding the trial until a November 15, 2012 pretrial hearing before the Honorable Brad Karren, who ultimately presided over the trial and subsequent plea hearing. At that pretrial hearing, Mr. Smith's then-appointed attorney requested to be relieved as counsel of record. (#40-2 at 128-29, #40-3 at 133) She explained that the attorney-client relationship had become "hostile." (#40-3 at 142) She then clarified that she did not mean "hostile in terms of being threatening to me," but rather, that she and Mr. Smith simply continued to disagree about how the defense should proceed. (*Id.*)

On June 6, 2013, Mr. Smith appeared for a new bond hearing with his newly appointed attorney, David Hogue, for reasons unrelated to any misconduct.[7] (#40-2 at 175; #40-3 at 187) Mr. Hogue argued that Mr. Smith should remain free on bond, highlighting the fact that Mr. Smith had never missed a court appearance and was working toward completing a business degree at a local college. (*Id.* at 192) In granting bond, Judge Karren commented:

> Mr. Smith . . . I have seen you in court. You have been extremely patient during the course of this, these proceedings. You've shown respect and you have been - - held yourself in proper demeanor at all times. You've shown up in court well dressed.  You have been nothing but a gentleman during all of these proceedings. And I think the motion is well taken.

(#40-3 at 193) Five weeks before trial, however, Mr. Smith was arrested and charged with aggravated robbery. As a result, bond was revoked. (#40-2 at 198, #40-3 at 199-203, #40-8)

---

[7] The bond company with which Mr. Smith had contracted had dissolved; therefore, bond had to be reconsidered with a new bonding company.

Two weeks before trial, Mr. Smith appeared before Judge Karren in prison clothes with shackles on both his ankles and wrists. (#40-9 at 1) Unbeknownst to Mr. Smith, prior to this hearing, Mr. Hogue had met with Judge Karren and the prosecuting attorneys to report that Mr. Smith recently had threatened him with bodily harm.[8] (#69 at 16-18, 130-31, 163, 173-76) Mr. Hogue testified that he had not had any conflicts with Mr. Smith and considered the threat to have "come-out-of-the-blue." (*Id.* at 21) Mr. Smith denies ever threatening Mr. Hogue. (*Id.* at 98)

Both Judge Karren and Stuart Cearley, one of the two prosecuting attorneys present that day, testified at the federal evidentiary hearing[9] that this Court should not place too much weight on Judge Karren's complimentary statements to Mr. Smith at the June 6, 2013 hearing because it was Judge Karren's practice to compliment difficult defendants as a sort of reverse psychology. (#69 at 135, 140, 171) Mr. Cearley explained that Judge Karren often complimented criminal defendants as a way to encourage their good behavior while respecting their dignity by not "talking down" to them. Mr. Cearley added that the transcript does not properly reflect how confident and self-assured Mr. Smith presented himself in the courtroom. (*Id.* at 172)

---

[8] At the federal evidentiary hearing where Mr. Hogue divulged this evidence for the first time, Mr. Hogue declined to testify under oath as to the contents of Mr. Smith's threats, citing attorney-client privilege. It remains unclear whether Mr. Hogue considered this a privileged communication when he divulged the same information at the meeting with the state prosecutors and the trial judge. (#69 at 17)

[9] The Court notes Director Payne's objection to this Court's decision to hold an evidentiary hearing and to the use of evidence received at the hearing. (#61, #69 at 4-5) His objection is saved should he wish to raise the issue before Judge Marshall.

Judge Karren and Mr. Cearley further testified that they interpreted the threat as a possible attempt by Mr. Smith to cause a mistrial or a further continuance of the trial. (#69 at 131, 163) Judge Karren testified that his decision to require Mr. Smith to wear the stun belt was based on a number of factors: Mr. Smith had repeatedly come to court in an agitated state; he was concerned both about the threat to Mr. Hogue and thought that it might have been a hint from Mr. Smith that he would attempt to cause a mistrial; and, he was concerned about Mr. Smith's capacity for violence given his recent arrest for aggravated robbery, which included allegations that Mr. Smith had held a loaded pistol to the victim's head. The local SWAT team had extricated Mr. Smith, still armed, from his home where his girlfriend and her young son were present. (#40-2 at 192-94, #69 at 129-31, 161)

Judge Karren unwaveringly maintained at the hearing that he would have had Mr. Smith wear a stun belt even had he never learned about the threats to Mr. Hogue. (#69 at 134) Further, neither Judge Karren nor Mr. Cearley considered Mr. Hogue conflicted as a result of have been threatened, and Mr. Hogue insisted that the threat had no effect on his representation of Mr. Smith. (*Id*. at 21-22, 68, 157, 176)

In a pretrial hearing just before trial, Mr. Hogue stated on the record, in Mr. Smith's presence, that Mr. Smith was rejecting all plea deals and was proceeding to trial. (#40-9 at 2-3) Despite this representation, Mr. Smith stated to Judge Karren that he felt he was being pressured to take a plea deal. Judge Karren assured him that a jury trial was set and imminent. (#40-9 at 7-8) Thereafter, Judge Karren ordered that Mr. Smith be

brought to trial dressed in civilian clothes and "not in chains or in jail garb." (#40-9 at 8-

9) The following colloquy ensued:

| | |
|---|---|
| Judge Karren: | All right. Now let me stress something. Now, Mr. Hogue, you – and I agree – you had asked that Mr. Smith not be transported in shackles and I don't have any trouble with that. But his history is that he's got violent – Aggravated Assault[10] charge. I'm not going to put these deputies' lives in danger. What about having a kidney belt placed on Mr. Smith that would be underneath his clothing? |
| Mr. Hogue: | Your Honor, I would have no objection to that. |
| Judge Karren: | Skorup, can you get a kidney belt for Mr. Smith? |
| Deputy Skorup: | I believe so. |
| Judge Karren: | All right. Just so you understand, Mr. Smith, what this is, this kidney belt is 50,000 volts that goes through your backside over your kidneys. If you do anything that will disrupt this Court or disrupt the safety of these officers, they will give you 50,000 volts. Now that hurts like heck. I've had it happen to me before and it's not fun. |
| Mr. Smith: | I can imagine. |
| Judge Karren: | But the difference between that happening to me and you, Mr. Smith, is this, that when that goes over your kidneys you eliminate. Do you know what that means? |
| Mr. Smith: | Yeah. |
| Judge Karren: | You'll soil yourself. You'll loosen your bowels. So don't do that. |
| Mr. Smith: | Yeah. |

---

[10] Mr. Smith was actually charged with aggravated robbery. (#40-8)

(#40-9 at 10-11, #40-2 at 200)[11]

On the morning of trial, the parties met in chambers and on the record, and the Court made final decisions on pending motions. (#40-3 at 207-08) Mr. Smith was not present. At that meeting, Mr. Hogue stated that he believed Mr. Smith intended to testify and generally deny the charges. (#40-3 at 214) Mr. Hogue then added, "[n]ow, what he does in there, I might need some assistance with, Judge." (*Id.*) This discussion followed:

| | |
|---|---|
| Judge Karren: | Right. I looked at that last night just a little bit. I think I'm pretty solid on the law. And just to give you-all a heads up, and please, you know speak up. I know you-all don't have any fears about speaking up. But what I – what I think is if he rises to the level where I believe he is trying to conduct – get a mistrial, for example, yelling and standing up, cursing, something to that effect, then I will warn him one time. And then after that, if he continues to do so, I will have him removed. I'll have him sent into the holding cell and we will conduct the trial without him. I think I'm on pretty solid ground and that's how I intend to proceed. |
| Mr. Hogue: | Okay. |
| Judge Kareen: | Stuart? |
| Mr. Cearley: | Your Honor, I'm comfortable with it as far as a game plan. Obviously, circumstances will dictate and we will see how – I |

---

[11] Mr. Smith asserts that Judge Karren threatened to activate the stun belt if he tried to cause a mistrial by challenging the validity of the search and arrest warrants in front of the jury. (#69 at 104) Mr. Smith raised the same claim in the error *coram nobis* appeal; however, the Arkansas Supreme Court rejected it as unfounded. *Smith v. State*, 2017 Ark. 236, at 5 ("Smith concedes in his brief that the transcript of the hearing does not bear out his claim that the court threatened to have him shocked if he brought up certain issues at trial. He contends, however, that the transcript is not a 'true and accurate' transcript of the hearing. Smith offers no support for the claim, and we are not required to accept the allegations in a *coram nobis* proceeding at face value."). In his current petition, Mr. Lambert again asserts this claim at Mr. Smith's behest, but admits that no such threat can be found in the transcript. (#34-1 at 7) And, Judge Karren denied ever making that statement. (#69 at 129)

|                  | think – I think if he can control himself and calm back down - - |
|---|---|
| Judge Karren:    | We'll bring him back in, absolutely. |
| Mr. Cearley:     | I know you'll readdress that issue and adjust on the fly. |
| Judge Karren:    | Absolutely. David, if you feel like at a break you want to talk to him and he assures you he can calm down and come back in, certainly, we'll try again. |

* * *

| Judge Karren:    | This is one of these issues if he's doing this purposely, in fact, we'll call him in here and we'll put it on the record what we expect of him, what we want him to understand that we are going to be. If he goes down that road and he starts talking about those things, I will entertain an objection. I will certainly go up to the bench. I will have you, in low tones with the white noise on, speak to him about that. And if he continues to do that, then that will be a reason I will have him removed because I don't want to conduct a mistrial. |
| Mr. Hogue:       | Okay. My - - biggest fear is he's going to try to get up there and again entertain what's not relevant and try to throw the search warrant to you. That's what I fear. |
| Judge Karren:    | And I appreciate that. But I think you've got two excellent lawyers, just like you are. |
| Mr. Hogue:       | They'll put a stop to it. |
| Judge Karren:    | I think they'll put a stop to it. They'll make the proper objection. More than likely, I'll sustain that type of objection. And if he continues to do so, he will be removed. |

(#40-3 at 214-17)

Thereafter, the State raised the fact that it had filed an amended information that included a different charge. (#40-3 at 222) At that point, Mr. Smith was brought into chambers for his plea and arraignment on the new information. (*Id*. at 226)

After Mr. Smith entered his not-guilty plea, Judge Karren gave him the following

admonishment:

| | |
|---|---|
| Judge Karren: | Also, Mr. Smith, I wanted to address a few things. Every time I've seen you in court you've always acted appropriately. You have always been passionate, which I don't have any issue about, but when we have a jury in there I am going to remind you of a few things: One is there is certain relevant information that can only be talked about - - for example, there may be a discussion about settlement negotiations, okay. That's not permissible. I'm not going to allow that to happen. |
| Mr. Smith: | Okay. |
| Judge Karren: | That's just the way the rules are played. And that might upset you or make you feel agitated, but you're going to need to keep your composure. Okay? |
| | (Mr. Smith nodded his head.) |
| Judge Karren: | Remember that jury is watching not only you but how [sic] the attorneys and the Court all at the same time. |
| | (Mr. Smith nodded his head.) |
| Judge Karren: | You know, profanity, you will need to really be careful about the use of profanity. Okay? |
| [Mr. Smith]: | Yes, sir. |
| Judge Karren: | If you start to get agitated or if you start to act out in there, my game plan is that I will give you a warning. |
| | (Mr. Smith nodded his head.) |
| Judge Karren: | And then if you don't heed my warning, then my intention is to go ahead and remove you from the courtroom and we will continue the trial while you're sitting in the cell. Are we clear on that? |
| Mr. Smith: | Yes, sir. |

Judge Karren:      I don't think I'll have any trouble, but I wanted to let you know what my plan was.

Mr. Smith:      Okay.

(#40-3 at 227-229) Thereafter, the trial began.

B.    Trial and Plea

At the federal evidentiary hearing, Mr. Smith admitted, and Mr. Hogue and Mr. Cearley confirmed, that as soon as opening argument began he asked if a plea was still an option. (#69 at 31, 62, 105, 165-66) Mr. Hogue testified that he immediately relayed to Mr. Cearley Mr. Smith's desire to plead guilty. (*Id.* at 31-32) Mr. Cearley recalled that Mr. Smith and Mr. Hogue were talking back-and-forth during both his opening statement and the first witness's testimony. (*Id.* at 165) Mr. Cearley confirmed that, at some point, Mr. Hogue handed him a note that read "he wants to plea." (*Id.* at 166) However, the plea negotiation did not occur until the first recess. (*Id.* at 33, 65, 107, 166)

Adam Howard, a Sergeant in the Benton County Sheriff's Office Narcotics Unit, was the State's first and only witness before the plea negotiation. (#40-4 at 149-50). Sergeant Howard testified, without objection, about his personal supervision of the confidential informant's (CI) relationship with Mr. Smith. (*Id.* at 150-58). Sergeant Howard recounted three separate controlled buys between the CI and Mr. Smith. (*Id.* at 158-197) Audio taken from telephone conversations between the CI and Mr. Smith was played for the jury. Those conversations concerned the type and quantity of drug to be purchased, as well as meeting times. (*Id.*) Sergeant Howard explained that he

accompanied the CI on each of the buys. On the third buy, he was able to personally identify Mr. Smith as the seller. (*Id.* at 195)

Sgt. Howard testified that he had obtained a warrant for a nighttime search of Mr. Smith's one-bedroom apartment after learning that Mr. Smith had recently been resupplied with narcotics. (#40-4 at 199-202) State officers executed the warrant at 4:00 a.m. (*Id.* at 201) They found Mr. Smith in the bedroom with his girlfriend, and a four-year-old child was sleeping on a couch. (*Id.* at 202) Photographs depicting the location and evidence seized – cocaine, marijuana, drugs, cash, and drug paraphernalia – were admitted without objection. (*Id.* at 202-04, 217, 219, 221-22) In his testimony, Sergeant Howard discussed each photograph, described the evidence pictured, and stated where in Mr. Smith's apartment each piece of evidence had been discovered. (*Id.* at 204-22)

After hearing roughly two hours of testimony, Judge Karren interrupted Sgt. Howard's direct examination to give the jury a fifteen-minute recess. (*Id.* at 222-223) The recess extended to an hour; and when the parties returned, they announced that they had reached a plea agreement. (*Id.* at 223-24)

The prosecution had rescinded the original plea offer. (#69 at 96, 107) Mr. Smith accepted the State's new offer, however, and pleaded guilty to two counts of simultaneous possession of drugs and firearms (Class Y), two counts of delivery of cocaine (Class Y), delivery of marijuana (Class C), possession of cocaine with intent to deliver (Class Y), and possession of drug paraphernalia (Class C) in case number CR-08-1239. (#40-2 at 209-22) As part of the plea agreement, the State orally moved to reduce the aggravated robbery charge (Class Y) to simple robbery (Class B) in case number CR-

13

13-1525. (#40-4 at 224) Mr. Smith also pleaded guilty to that reduced charge. (#40-4 at 228)

The trial court reviewed the terms of the plea agreement with Mr. Smith, inquiring into his understanding of the terms of the agreement and the effect his guilty plea would have on his appellate rights. The judge specifically asked Mr. Smith about the voluntariness of the guilty plea. (#40-4 at 224-227) Mr. Smith denied that his decision to change his plea was the result of coercion or intimidation and responded that he understood each of his rights. (*Id*. at 224-227)

Thereafter, the State read the facts supporting the charges against Mr. Smith, including the multiple drug sales to the CI, as well as the evidence seized from Mr. Smith's apartment. (*Id*. at 227-28) The State next read the facts supporting the aggravated-robbery charge. (*Id*. at 228) Mr. Smith admitted that the facts the prosecutor recited were true. (*Id*. at 228) The trial court accepted Mr. Smith's guilty plea and the State's recommended sentence. (*Id*. at 230) Mr. Smith was sentenced to an aggregate sentence of 40-years' imprisonment in the Arkansas Department of Correction, with 10 years' suspended imposition of sentence. (#40-2 at 209-13, #40-4 at 230-231)

At the conclusion of the plea hearing, Judge Karren made the following comment:

> Mr. Smith, your behavior in this courtroom has been exemplary. You've always been a model person. You've been passionate but you've not been disrespectful, and I appreciate your courtroom demeanor.

(#40-4 at 233)

Mr. Smith was taken into custody, and the jury was excused. Afterward, the attorneys and Judge Karren discussed what to do with trial exhibits since Mr. Smith had

given up his right to appeal by pleading guilty. (#40-4 at 236) Judge Karren stated that he

was sure Mr. Smith had waived his right to appeal: "Mr. Smith is not one to sit silently if

he doesn't feel like his rights are being trampled . . ." (*Id*. at 237)

C.    Postconviction

In the week following his guilty plea, Mr. Smith wrote to Judge Karren

complaining about ineffective assistance of his counsel. (#40-2 at 224) In the letter, Mr.

Smith explained that the "main reason" he took the plea deal was because Mr. Hogue had

"made it very clear to me that he was not going to tell the jury about any of the

inconsistencies/false documents in [his] paperwork." (*Id*. at 224) Mr. Smith continued:

"Once my attorney let all of the evidence get admitted without objection, he informed me

that there was nothing he could do and continued to overly encourage me to take a plea

on these groundless allegations." (*Id*. at 225)

Nevertheless, Mr. Smith admitted at the federal evidentiary hearing that he had

long understood that his challenge to the validity of the search and arrest warrants had

been unsuccessful and that all of his trial attorneys had explained to him that the evidence

seized from his house was admissible and could lawfully be used at trial. (#69 at 110)

Further, Mr. Smith acknowledged that Mr. Hogue had spoken to him before trial about

the same evidence and had made sure he understood that he was facing 240 or more

years' imprisonment if the jury found him guilty and "stacked" the sentences. (*Id*. at

113). Finally, Mr. Smith testified that he was not lying when he entered his guilty plea;

rather, he explained that he did not know that the effect the stun belt had on him

mattered. (*Id.* 114)

Mr. Smith sought state-postconviction relief by timely filing a *pro se* petition for Rule 37 relief on January 21, 2014. (#40-2 at 235-42). In that petition, he asserted, among other claims, that Mr. Hogue did not effectively represent him because he failed to challenge the validity of the search warrant and supporting documents; erroneously allowed the State to introduce evidence without objection; and failed to object to the State's failure to call the CI as a witness, thereby violating his right to confront a witness against him. (*Id*.) Of particular note, Mr. Smith asserted that he was coerced into pleading guilty because of Mr. Hogue's advice that there was nothing to be done about the unconstitutionally seized evidence and that the best course of action was to accept a plea deal. (*Id*. at 240)

The State asked that the Rule 37 petition be dismissed due to Mr. Smith's failure to comply with the procedural requirements governing Rule 37 petitions. (#40-2 at 246-47) The trial court agreed and dismissed the petition for exceeding the thirty-line-per-page limit. (*Id*. at 248-49)

Mr. Smith promptly corrected the form of his petition and refiled it, asking that it be considered a reply to the State's response to his first petition. (*Id*. at 250-58) The State argued that the trial court should dismiss the petition because the rules would not allow the consideration of a second petition. (*Id*. at 259-60) The trial court declined to reconsider its decision and held that a second Rule 37 petition was not permitted under the rules. (*Id*. at 262-63)

Mr. Smith appealed the denial of his Rule 37 petition. (#40-2 at 264-65) The Arkansas Supreme Court affirmed the dismissal. *Smith v. State*, 2015 Ark. 23, at 2 (*per curiam*).

During the pendency of the Rule 37 appeal, Mr. Smith filed a *pro se* petition for state habeas corpus relief with Chicot County Circuit Court. (#40-6 at 4-10) In that petition, he challenged the validity of the search warrant, raised allegations of prosecutorial misconduct, asserted speedy trial violations, and asserted that he pleaded guilty plea only because his attorney failed to object to the State's introduction of evidence. (*Id*.) The State argued that none of Mr. Smith's claims challenged the validity of the judgment, so the petition should be dismissed. (*Id*. at 47-49) The circuit court agreed and dismissed the petition. (*Id*. at 69-73)

Mr. Smith filed a Motion for Modification, asking the circuit court to reconsider its denial of his habeas petition. (*Id*. at 74-80). In that motion, Mr. Smith asserted for the first time that his guilty plea was coerced because he was made to wear the stun belt. He also asserted that he was denied effective assistance of counsel when his attorney failed to object to the use of the stun belt. (*Id*. at 77-79) The circuit court did not address the new allegations in denying the motion. (*Id*. at 81)

Mr. Smith appealed and moved to have the appellate record supplemented with a personal affidavit recounting the October 14, 2013 hearing at which Judge Karren ordered him to be fitted with a stun belt. *Smith v. Hobbs*, 2015 Ark. 312, at 2 (*per curiam*). The Arkansas Supreme Court denied the request to supplement the record. *Id*. The court also rejected any future request to have the hearing transcribed, finding that it

17

could not consider anything that had not first been presented to the circuit court. *Id*. The Arkansas Supreme Court affirmed the circuit court and dismissed Mr. Smith's appeal, holding that the asserted grounds for relief could not be addressed in a state habeas proceeding. *Id*. at 3-7.

On February 27, 2015, Mr. Smith filed a *pro se* petition for a writ of error *coram nobis* in the Benton County Circuit Court.[12] (#40-10 at 6-10). When no action was taken on the first petition, Mr. Smith filed a second *pro se* petition on January 6, 2016. (*Id*. at 10-16) In both petitions, he argued that he had been coerced into pleading guilty after the trial judge ordered him to wear a stun belt at trial. He also raised a *Brady* claim. (*Id*. at 6-16) The State responded. (*Id*. at 24-26) The trial court denied his request for error *coram nobis* relief, finding that the claims were both untimely and unfounded. (*Id*. at 53-60)

Mr. Smith appealed. The Arkansas Supreme Court affirmed the trial court. (#40-15); *Smith v. State*, 2017 Ark. 236, at 8. Under the standards governing state error *coram nobis* petitions, the Arkansas Supreme Court rejected Mr. Smith's assertion that his guilty plea was coerced:

> Smith presented no facts to establish that he had been threatened that the belt would be activated if he chose to go to trial and raise a particular issue or issues. The court clearly explained that the belt was to curb any violent outburst by Smith on the way to trial or at trial.

*Id*. at 4-5.

---

[12] Because Mr. Smith pleaded guilty and could not pursue a direct appeal, the circuit court retained jurisdiction to hear his petition for writ of error *coram nobis*. See, *e.g.*, *Dansby v. State*, 343 Ark. 635, 637 (2001) (*per curiam*).

After exhausting his state remedies, Mr. Smith's federal case was reopened, and Craig Lambert was reappointed as his federal habeas counsel. (#28) Mr. Lambert filed an amended petition for federal habeas corpus relief on Mr. Smith's behalf. (#34, #35) After Director Payne responded to the amended petition (#40), the Court held an evidentiary hearing narrowly focused on the use of a stun belt, citing the holdings in *United States v. Honken*, 541 F.3d 1146 (8th Cir. 2008) and *United States v. Durham*, 287 F.3d 1297 (11th Cir. 2002).

At the evidentiary hearing, Mr. Smith learned, for the first time, that Mr. Hogue had met with Judge Karren and State prosecutors outside his presence to inform them that Mr. Smith had threatened him with physical harm. In light of this evidence, Mr. Smith was granted permission to file a second amended habeas petition to add a claim that his guilty plea should be set aside because of his trial counsel's conflict of interest. (#65, #66, #69 at 37) Director Payne responded that this claim was procedurally defaulted and without merit. (#72)

## IV. **The Arkansas Supreme Court's decision that Mr. Smith's guilty plea was not coerced is due deference and should be affirmed.**

### A. Background

Mr. Smith makes a free-standing claim that his guilty plea was coerced by virtue of the trial judge forcing him to wear a stun belt at trial. In his first amended petition for habeas relief, Mr. Smith contended that the Arkansas Supreme Court unreasonably applied clearly established federal law and unreasonably applied the law to the facts when it determined that his guilty plea was not coerced. (#34-1 at 20); see 28 U.S.C.

19

§2254(d)(1) & (2). Mr. Smith reiterated this argument at the federal habeas hearing, asserting that the decision was not due any deference and also arguing that the claim had been "fairly presented . . . in [the] *coram nobis* petition, and it was addressed on the merits by the Arkansas Supreme Court." (#69 at 188) Specifically, he argued the Arkansas Supreme Court had not understood and, therefore, had misapplied caselaw governing the use of stun belts. (#34-1 at 20) In response, Director Payne argued that the merits ruling was not unreasonable and, therefore, was due deference. (#40 at 15, #72 at 9-10)

In reply, Mr. Smith changed course, arguing that the Arkansas Supreme Court had <u>not</u> rendered a merits decision on the constitutional claim that his guilty plea was coerced. (#74 at 4) He now contends that the Arkansas Supreme Court's decision was based on state law governing error *coram nobis* claims of coercion. Apparently recognizing that his free-standing constitutional claim is procedurally defaulted, Mr. Smith argues that the state procedural ground for denying him Rule 37 relief was not adequate and, alternatively, that his default should be excused under *Martinez v. Ryan*, 566 U.S. 1 (2012). Finally, Mr. Smith contends that, because this Court will likely consider new evidence presented in the federal habeas evidentiary hearing, a *de novo* review of all evidence is required. (#74 at 4-9)

Mr. Smith conflates his free-standing constitutional coercion argument – that the use of the stun belt alone resulted in a coerced plea – with his argument that Mr. Hogue was ineffective for failing to object to the use of the stun belt. Only the ineffective-assistance-of-counsel claim, however, falls under the procedural default exception

announced in *Martinez*. *Martinez*, 566 U.S. at 17 ("procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance"). Mr. Smith's "adequacy" argument as cause to excuse the procedural default of his other claims will be addressed below in the discussion of whether claims are procedurally defaulted.

In support of his "*de novo*" review suggestion, Mr. Smith cites to *Holland v. Jackson*, 542 U.S. 649 (2004), where the Court noted that "some Courts of Appeals have conducted *de novo* review" when new evidence is admitted. *Id.* at 653 (emphasis added). Despite his extensive list of cases supporting his *de novo* argument, none were from the Eighth Circuit, and this Court finds none. (#74 at 4-6)

B.    Standard of Review

Federal habeas corpus relief lies for state prisoners whose custody violates either the Constitution or law or treaties of the United States. 28 U.S.C. § 2254(a). A court may not issue a writ of habeas corpus, however, unless the applicant exhausts available state remedies prior to filing the petition. § 2254(b)(1)(A).

A claim is deemed exhausted when a petitioner has "present[ed] his federal claims to the state courts in a timely or procedurally correct manner in order to provide the state courts an opportunity to decide the merits of those claims." *Kennedy v. Delo*, 959 F.2d 112, 115 (8th Cir. 1992). Once a merits decision has timely been obtained, a federal court can overturn the state court's decision only if it:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was

based on an unreasonable application of the facts in light of the evidence presented in State court proceedings.

28 U.S.C. § 2254(d).

A highly deferential standard applies when a prisoner's claim has been adjudicated on the merits in state court. *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). The federal court must presume that the state court's factual findings are correct, and a petitioner must rebut this presumption with clear and convincing evidence. *White v. Kelley*, 824 F.3d 753, 757 (8th Cir. 2016). Importantly, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]" *Rainer v. Kelley*, 865 F.3d 1035, 1044 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 1167 (2018) (quoting *Johnson v. Williams*, 568 U.S. 289, 301, 302 (2013)).

In the context of §2254(d)(1), the phrase "clearly established Federal law" refers to Supreme Court holdings, not dicta, that existed at the time of the relevant state court decision. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). Further, the law is deemed "clearly established" only with regard to issues that the United States Supreme Court has "squarely addressed" in its precedents. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (quoting *Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (*per curiam*)).

C.    Stun Belt Law

Given Mr. Hogue's admittedly limited knowledge of the law regarding the use of stun belts; and, given Judge Karren's decision not to hold a hearing before ordering that

Mr. Smith be required to wear a stun belt at trial, a review of the law governing restraining a criminal defendant is in order. (#69 at 15, 133, 155, 158)

The law regarding criminal defendants' presence, attire, and conduct in court—and the effect those factors have on the outcome of trials—has evolved over the last 50 years or so. The stun belt, "a method of prisoner restraint, used as an alternative to shackles," is one of the newer restraint devices; but use of a stun belt "raises all of the traditional concerns about the imposition of physical restraints." *Gonzalez v. Pliler*, 341 F.3d 897, 899-900 (9th Cir. 2003).

Fifty years ago, the Supreme Court held that a defendant could forfeit his rights to be present at every stage of his trial, if his behavior justified removal from the courtroom. *Illinois v. Allen*, 397 U.S. 337, 343 (1970). In so holding, the Court noted:

> It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case.

*Id.* The Court suggested "three constitutionally permissible ways for a trial judge to handle an obstreperous defendant," including, binding and gagging the defendant, citing him for contempt, or removing him from the courtroom until he could conduct himself appropriately. *Id*. at 343-44. The Court acknowledged, however, that shackling a defendant could result in prejudicing the jury against the defendant, insulting the dignity of the courtroom, and hampering the defendant's ability to communicate with his

counsel. Nonetheless, the *Allen* Court held that, when used sparingly, shackling might be necessary. *Id*. at 344.

After *Allen*, the Supreme Court held that, while States cannot compel defendants to appear at trial in jail garb because of the danger of undue prejudice, *Estelle v. Williams*, 425 U.S. 501, 505 (1976), the presence of uniformed armed guards is not inherently prejudicial. *Holbrook v. Flynn*, 475 U.S. 560, 569 (1986) ("While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable.") Later, in *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court held that <u>visible</u> physical restraints are prohibited "absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Id*. at 629.

Adhering to Supreme Court precedent, the Arkansas Supreme Court has definitively stated that a defendant *shall not* be restrained in court unless the restraints are necessary to maintain order. *Flores v. State*, 350 Ark. 198, 210 (2002) (relying on ARK. R. CRIM. P. 33.4[13] and *Allen*, 397 U.S. 337)). "Only in the rarest circumstances will the

---

[13]Arkansas Rule of Criminal Procedure 33.4, *Custody and restraint of defendants and witnesses*, states:

> Defendants and witnesses shall not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to maintain order. If the trial judge orders such restraint, **he shall enter into the record of the case the reasons therefor**. Whenever physical restraint of a defendant or witness occurs in the presence of jurors trying the case, the judge shall upon request of the defendant or his attorney instruct the jury that such restraint is not to be considered in assessing the proof and determining guilt.

(Emphasis added).

state's interest in security and order justify [visible shackling]." *Id*. (quoting *Clemmons v. State*, 303 Ark. 265 (1990) (court's decision to visibly shackle and guard defendant supported by specific findings regarding need for restraint)). In *Flores*, the Arkansas Supreme Court determined that the defendant had been deprived of a fair trial and that leg restraints were inherently prejudicial because he, "had no record of prior criminal history, had not caused any previous disruptions in court, and there was no evidence of an attempted escape." *Id*. at 212.

Since the *Deck* decision, "the Supreme Court has not extended the constitutional protection against unnecessary physical restraints during trial beyond the use of visible restraints." *Mizell v. Warden, Madison Correctional Inst*., No. 1:10-CV-53, 2011 WL 2636836, at *10 (S.D. Ohio Apr. 27, 2011), *report and recommendation adopted*, No. 1:10-CV-53, 2011 WL 2636255 (S.D. Ohio July 6, 2011) (habeas relief denied because there was no evidence that the stun belt was visible or that it impeded the defendant's ability to represent himself or assist his counsel; therefore, state court's finding of no unfair prejudice was due deference.)

Although the Supreme Court has not commented on the use of stun belts at trial, federal circuit courts have begun to develop a body of case law. In 2002, the Eleventh Circuit reversed a district court's decision to require the defendant to wear a stun-belt during trial, concluding there were insufficient findings in the record to support the decision. *United States v. Durham*, 287 F.3d 1297, 1300 (11th Cir. 2002). Durham was tried for several bank robberies. He had twice attempted to escape; and one of those attempts included a fairly elaborate scheme that included slipping out of leg irons, scaling

a razor-wire fence, and assaulting the responding security guard. *Id*. at 1301. Durham filed a pretrial motion asking the trial court to prohibit the use of the stun belt. But, after hearing argument of counsel and informally questioning the Marshal's service at a pretrial hearing, the district judge denied the motion and ordered that Durham be kept in shackles and a stun belt because of the "heightened security risk." *Id*. at 1302.

On appeal, the court recognized that a district judge retains both the discretion to restrain a defendant and the responsibility to ensure the progression and safety of a trial, but nevertheless reversed. Under the circumstances in that case, the trial judge had not applied the close judicial scrutiny required for using visible shackles and a stun belt. *Durham*, 287 F.3d at 1303-04 (internal citations omitted). The Eleventh Circuit noted that the district court had failed to make findings of fact "regarding the operation of the stun belt or the potential for accidental discharge." Further, the trial court had not explained why less restrictive methods – such as shackles alone – would have been inadequate and had not given Durham guidance on what "behavior would prompt the deputy to activate the stun belt." *Id*. at 1303. Relying on a decision from the Court of Appeals for the Fifth Circuit, the *Durham* Court held that the trial court must make a clear record of its reasons for restraining a defendant to demonstrate that it did not abuse its discretion. *Id*. at 1304 (citing *United States v. Theriault*, 531 F.2d 281, 284 (5th Cir. 1976)).

Noting that there were neither sworn statements nor findings of fact about the operation of the stun belt, the *Durham* Court questioned the district court's decision. "The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely chills a defendant's inclination to make any movements

26

during trial – including those movements necessary for effective communication with counsel." *Durham*, 287 F.3d at 1305. While a stun belt may be less visible than shackles, it also imposes a substantial burden on a defendant's ability to participate in his own defense, confer with his attorney; and, if activated, poses a serious threat to the dignity of a courtroom. *Id.* at 1306.

In contrast, in *United States v. Brantley*, the Third Circuit affirmed the defendant's conviction after finding that wearing shackles during trial did not contribute to the guilty verdict or undermine his testimony, because the evidence of guilt was overwhelming. *United States v. Brantley*, 342 F. App'x 762, 768 (3d Cir. 2009), *cert. denied*, 558 U.S. 1133 (2010).

The *Brantley* Court ultimately denied the defendant relief, but nevertheless cautioned:

> [N]o court should take imposing restraints lightly or cavalierly. Unjustified shackling is a remnant of an earlier era when the accused was brought from prison to the courtroom in chains, unkempt and wearing (at best) prison attire, following which he was exposed to a jury in the worst possible light. The practice evokes the dehumanizing specter of slavery, and is far from the law's promise of respect owed to each individual, including the accused. It is an extreme measure, that the Supreme Court considers "a last resort." Any court considering such an extreme measure must first establish that it is actually necessary, not simply a matter of practice or convenience. And in making such a determination, a district judge must scrupulously "make a case specific and individualized assessment" that supports his decision to shackle a defendant and provides a reviewing court with an adequate record. There is certainly nothing convenient about requiring anyone to suffer the indignity of shackling unless his or her own conduct justifies it.

*Id.* (internal citations omitted).

In *Gonzalez, supra*, the Ninth Circuit reversed the dismissal of a federal habeas petition finding that Gonzalez's due process rights were violated because he was made to wear a stun belt throughout trial. "Before a court may order the use of physical restraints on a defendant at trial, 'the court must be persuaded by compelling circumstances that some measure is needed to maintain security of the courtroom,' and 'the court must pursue less restrictive alternatives before imposing physical restraints.'" *Gonzalez*, 341 F.3d at 900 (quoting *Duckett v. Godinez*, 67 F.3d 734, 749 (9th Cir. 1995) ("In all [ ] cases in which shackling has been approved," there has been "evidence of disruptive courtroom behavior, attempts to escape from custody, assaults or attempted assaults while in custody, or a pattern of defiant behavior toward corrections officials and judicial authorities.")). The Court remanded the case with directions to hold an evidentiary hearing to determine whether the error was prejudicial.

On remand and after a hearing, the district court determined that the claim was not procedurally barred and that the use of the stun belt amounted to prejudicial error. *Gonzalez v. Pliler*, No. 2:01-CV-300, 2008 WL 11411353 (C.D. Cal. Nov. 10, 2008). On appeal, the Ninth Circuit affirmed the district court's grant of relief. *Gonzalez v. Pliler*, 395 F. App'x. 453, *1 (9th Cir. 2010).

In a pre-*Deck* decision, the Eighth Circuit upheld a district court's decision to have a defendant visibly shackled despite neither holding a pretrial hearing nor making findings of fact on the record as to why the circumstances demand it. See *United States v. Stewart*, 20 F.3d 911, 915-916 n.8 (8th Cir. 1994) (defendant on trial for physically assaulting a government witness during a hearing in a separate case was properly

28

shackled due to his behavior for which he was being tried as well as his repeated disruptive behavior in court.) The Eighth Circuit, however, has since applied the "close judicial scrutiny" standard set out in *Durham*, *supra*, affirming a district court's decision to fit the defendant with shackles and a stun belt after an evidentiary hearing. *United States v. Honken*, 541 F.3d 1146, 1162-64 (8th Cir. 2008), *cert. denied*, 558 U.S. 1091 (2009). The Court determined that the district court's decision was justified given the defendant's prior escape attempts, martial arts training, and threats against witnesses, security officers, and attorneys. *Id*.

Case law outlines the level of scrutiny required for restraining defendants generally and using stun belts specifically, but all of the cited cases involved direct appeals of convictions or habeas review of a merits decision. Importantly, neither *Brantley*, *Durham*, nor *Honken* concerned the habeas review of a procedurally defaulted claim – a much narrower review.

Nevertheless, the circumstances in this are troubling. The trial court required Mr. Smith to wear shackles and stun belt at trial even though he had little-to-no criminal history; he had no history of courtroom outbursts or escape attempts; there was no hearing to determine the least restrictive restraints necessary to insure safety and decorum; and Mr. Smith was not present at the in-chambers meeting where the trial court made the decision to have Mr. Smith fitted with a stun belt at trial. Furthermore, like the defendant in *Durham*, *supra*, Mr. Smith was apparently never told who—or what behavior—could or would trigger the stun belt.

A majority of courts that have addressed the use of courtroom restraints have required, at a minimum, a factual determination of the trial court's reasons for the restraint. For these reasons, this Court ordered an evidentiary hearing in order to better understand the trial court's reasons for requiring Mr. Smith to wear the stun belt at his trial. (#41) The attorneys were specifically directed to be prepared to address the *Honken* and *Durham* holdings.

Since the January 8, 2019 hearing, the Eleventh Circuit has declined to extend its *Durham* opinion in the case of a §2254 petitioner who, like Mr. Smith, challenged a state supreme court merits decision. *Nance v. Warden, Georgia Diagnostic Prison*, 922 F.3d 1298 (11th Cir. 2019). Specifically, the Eleventh Circuit held that the Georgia Supreme Court's decision regarding the use of a stun belt was not contrary to clearly established federal law because the United States Supreme Court had not specifically addressed the judicial scrutiny required for the use of stun belts. *Id.* at 1306-07.

On facts similar to those in Mr. Smith's case, a capital defendant pleaded guilty after a jury was empaneled and opening statements were made. *Fitzpatrick v. Bradshaw*, No. 1:06-CV-356 (S.D. Ohio Oct. 14, 2008); 2008 WL 7055605, *27-28. After a recess and outside of the jury's presence, the defendant made several outbursts. *Id.* After another recess, the defendant, now fitted with a stun belt, returned to the courtroom to enter his guilty plea. *Id.*

On habeas review, the federal district court found the petitioner's claims of the unconstitutional use of a stun belt to be procedurally defaulted. *Id.* at *28. Alternatively, the district court determined that the petitioner could not succeed on the merits, despite

the lack of a hearing on the use of restraints. The petitioner's courtroom behavior at trial

had justified the use of the restraints; thus, the petitioner could not demonstrate prejudice.

*Id.* at *28-33. The Court held:

> The evidence of guilt was overwhelming. Fitzpatrick pled guilty to all
> counts, and additionally the State presented witnesses to various aspects of
> the crime. There is no evidence that the jury was aware of shackling, as the
> record reflects that the jury was not present in the courtroom at the time of
> Fitzpatrick's outburst and reference to the stun belt. Furthermore,
> Fitzpatrick eventually waived his right to a jury, opting instead to plead in
> front of a three-judge panel. As the jury was not involved in the decision
> making process, it is clear that the stun belt did not have a "substantial and
> injurious effect or influence in determining the jury's verdict."

*Id.* at *33, *supplemented*, No. 1:06-CV-356, 2008 WL 7055606 (S.D. Ohio Dec. 17,

2008), and *report and recommendation adopted*, 2009 WL 3734143 (S.D. Ohio Nov. 5,

2009), *aff'd sub nom.*, *Fitzpatrick v. Robinson*, 723 F.3d 624 (6th Cir. 2013), *cert. denied*,

572 U.S. 1090 (2014).

     D.    Application

     As discussed, visible restraints are prohibited absent a determination by the

presiding judge that there is a legitimate reason for the restraints. *Deck*, 544 U.S. at 629.

The Supreme Court has not extended this holding to non-visible restraints; nor has the

Supreme Court addressed the coercive effect, if any, of restraints during a guilty plea

proceeding.

     Judge Karren specifically directed that Mr. Smith not be brought to court in jail

garb or visible shackles; and, in ordering that Mr. Smith wear a stun belt, Judge Karren

apparently decided that, since circumstances required restraints, non-visible restraints

were the best solution. Despite Mr. Smith's assertions that the stun belt was visible

because it stuck out an inch from his back, the testimony at the evidentiary hearing was that the stun belt was not, in fact, visible to the jury. (#69 at 22-23, 35, 38-39, 53-55, 100-01, 145, 165) Accordingly, Mr. Smith cannot overcome the first threshold required to prevail in a §2254(d)(1) petition; that is, demonstrating that the Arkansas Supreme Court unreasonably applied clearly established federal law – given that the United States Supreme Court has not squarely addressed this issue.

Even were the Court to assume that *Deck* and the other Supreme Court cases regarding the use of restraints extends to stun belts, Mr. Smith still cannot demonstrate that the Arkansas Supreme Court's decision was an unreasonable application of federal law. In denying error *coram nobis* relief, the Arkansas Supreme Court held that Mr. Smith's claim was not coerced under state law. *Smith*, 2017 Ark. 236, at 4. Specifically, the Court held that his guilty plea was not the result of either "fear, duress, or threats of mob violence" or "physical, moral, or economic force." *Id.* (internal citations omitted).

Similarly, federal courts have held that coerced pleas are those that result from threats or intimidation. See *e.g.*, *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969); see also *Gonzalez v. United States*, L-04-CR-1213, 2007 WL 954220, at *6 (S.D. Tex. Mar. 26, 2007) ("Coercion" is defined as "compulsion by physical force or threat of physical force."), *aff'd*, 592 F.3d 675 (5th Cir. 2009), *cert. denied*, 562 U.S. 900 (2010). "A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void." *Machibroda v. United States*, 368 U.S. 487, 493 (1962). A plea is generally considered voluntary if it is the product of a reasoned decision under the guiding hand of

counsel. *Brady v. United States*, 397 U.S. 742, 748-50 (1970). Moreover, a defendant's decision to plead guilty to avoid a harsher sentence is not deemed coerced. *Id.* at 752–53.

Even though the Arkansas Supreme Court reached its decision on state law grounds, because Arkansas law governing coercion mirrors federal law, that court's finding does not contravene federal law and, therefore, is entitled to deference. See *Richter*, 562 U.S. at 98 ("[A] state court need not cite or even be aware of [Supreme Court] cases" for a decision to be considered a merits decision under §2254(d)).

Mr. Smith argues that he faced an untenable choice: "continuing with trial silent, seated, still . . . or give up and pleading guilty." (#34-1 at 20) The Arkansas Supreme Court considered this argument and rejected it. "Smith presented no facts to establish that he had been threatened that the belt would be activated if he chose to go to trial and raise a particular issue or issues." *Smith*, 2017 Ark. 236, at 4-5. This determination is due deference.

There is no evidence, in either the original record before the Arkansas Supreme Court or from the federal evidentiary hearing, that Mr. Smith was threatened in any way to change his plea. (#69 at 66-68) Mr. Smith admitted that he was not lying when he pleaded guilty; rather, he explained he simply did not know "the stun belt was illegal at the time." (#69 at 114) Of course, the use of a stun belt is not, in fact, illegal – just ill-advised absent a record of proper judicial scrutiny. See ARK. R. CRIM. P. 33.4 (state criminal rule requiring judicial reasons for use of restraints be entered on the record).

Mr. Smith cites no law, and this Court finds none, holding that the use of a stun belt, standing alone, or restraints of any kind for that matter, invalidates a guilty plea.

33

Instead, declarations made on the record at the time of a plea carry a strong presumption of truth. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Mr. Smith has not alleged that Mr. Hogue misled him with regard to his guilty plea. In fact, he admits that he never made Mr. Hogue aware of any effect the stun belt was having on him. (#69 at 38, 115) And, by all accounts, including Mr. Smith's, he was freely able to converse with Mr. Hogue during opening argument and once trial began, as evidenced by the discussions of his desire to change his plea. (#69 at 31-32, 62, 105, 165-70)

Here, Mr. Smith waived his jury trial and entered a guilty plea. Importantly, he pleaded guilty only after the State's first witness (the detective who had orchestrated all three controlled cocaine buys and the search of Mr. Smith's home) testified at length and without objection. Given the weight of the detective's testimony and the overwhelming, uncontested evidence, it is difficult to imagine how Mr. Smith could have been acquitted.

Notably, Mr. Smith faced seven felony charges at trial; five were Class Y felonies, that each carried a minimum prison sentence of 10 years and a maximum sentence of 40 years, or possibly life in prison. ARK. CODE ANN. § 5-4-401(a)(1). Too, each conviction could have been ordered to be served consecutively. ARK. CODE ANN. § 5-4-403(a), (d).

Additionally, Mr. Smith faced a separate felony charge of aggravated robbery with a firearm, another Class Y felony. In that case, he faced a mandatory minimum 10-year sentence with additional mandatory-consecutive sentences as a habitual offender and because of the firearm. ARK. CODE ANN. §§ 5-4-501(b)(2), 16-90-120.

Instead, Mr. Smith pleaded guilty and received an aggregate 40-year sentence to resolve his eight pending Class Y felonies. Given the weight of the evidence presented by

the State's first witness and the daunting range of punishment Mr. Smith faced, his

decision to plead guilty is hard to question.

Mr. Smith's assertion that the Arkansas Supreme Court unreasonably applied the

law to the facts is unpersuasive. "A state court's determination that a claim lacks merit

precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough*

*v. Alvarado*, 541 U.S. 652, 664 (2004)). For Mr. Smith to prevail on this ground, the state

court decision must have been "so lacking in justification that there was an error well

understood and comprehended in existing law beyond any possibility for fairminded

disagreement." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (quoting *White v.*

*Woodall*, 572 U.S. 415, 419-20 (2014) (internal quotation marks omitted). Mr. Smith has

not met this burden; therefore, his claim of a coerced guilty plea should be denied.[14]

---

[14] See *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 841-43 (6th Cir. 2017)
(preserved due-process habeas claim regarding stun belt fails because no evidence that
the stun belt was visible. "Conversely, we cannot find any Supreme Court precedent that
speaks to the psychological impact of non-visible restraints and their interference with a
defendant's ability to present a fair defense."); *Sigmon v. Stirling*, No. 8:13-CV-1399,
2018 WL 4691197, *23-24 (D. S.C. Sept. 30, 2018) (procedurally defaulted IAC claim
for failing to object to stun belt could not be excused by *Martinez* because there was no
evidence that the belt was visible or that outcome of the case would have been different
had an objection been made); *Cassano v. Bradshaw*, No. 1:03-CV-1206, 2018 WL
3455531, *29-33 (N.D. Ohio July 18, 2018) (Ohio Supreme Court's finding on capital
habeas petitioner's preserved due-process claim regarding use of stun belt was not
contrary to law); *Bastian v. Ryan*, No. 16-02530, 2018 WL 5018070, *3, *7-8 (D.
Arizona Feb. 15, 2018) (Although trial counsel acted ineffectively by failing to request a
hearing on the use of a stun belt, habeas petitioner could not demonstrate he was
prejudiced in order to overcome procedural default of that claim); *Dixon v. Ryan*, No.
CV-14-258, 2016 WL 1045355, *16-18 (D. Arizona March 16, 2016), *aff'd*, 932 F.3d
799 (9th Cir. 2019) (Arizona Supreme Court's factual findings and application of *Deck*
were not unreasonable); *Morva v. Davis*, No. 7:13-CV-283, 2015 WL 1710603, *19-23

**V.    Mr. Smith's ineffective-assistance-of-counsel claims are procedurally defaulted; the default cannot be excused by *Martinez v. Ryan*, 566 U.S. 1 (2012); and the claims lack merit in any event.**

A.    Standard of Review

1.    Procedural Default

"[A] state prisoner who fails to satisfy state procedural requirements forfeits his right to present his federal claim through a federal habeas corpus petition, unless he can meet strict cause and prejudice or actual innocence standards." *Gordon v. Arkansas*, 823 F.3d 1188, 1196 (8th Cir. 2016) (quoting *Clemons v. Luebbers*, 381 F.3d 744, 750 (8th Cir. 2004) (citation omitted)). Procedural default bars federal review if the state court did not hear the claim because the prisoner failed to follow a state procedural rule, *Franklin v. Hawley*, 879 F.3d 307, 311 (8th Cir. 2018), *cert. denied*, 139 S. Ct. 116 (2018), (quoting *Martinez*, 566 U.S. at 9); or, if the petitioner failed to fairly present the claim in state court, and a state procedural rule would bar him from bringing the claim if he returned to state court. *Kennedy v. Kemna*, 666 F.3d 472, 480 (2012), *cert. denied*, 568 U.S. 1012 (2012) (a claim is procedurally defaulted if a petitioner failed to raise it in state proceedings).

2.    Cause for Default

A habeas petitioner's default can be excused, but only if he can demonstrate good cause for the default and actual prejudice flowing from a violation of federal law; or if he

---

(W.D. VA April 15, 2015) *aff'd*, 821 F.3d 517 (4th Cir. 2016), *cert. denied*, 137 S. Ct. 1068 (2017) (procedurally defaulted due-process claim regarding stun belt could not be excused, and the Supreme Court of Virginia neither unreasonably determined the facts nor unreasonably applied *Deck* or *Strickland*); *Fitzpatrick, supra*.

can demonstrate that the failure to consider his claims would result in a fundamental miscarriage of justice. *Franklin*, 879 F.3d at 311 (quoting *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). Under the cause-and-prejudice standard, cause is established when some objective factor external to the defense impeded efforts to comply with the state's procedural rules. *Id.* at 313 (citing *Coleman*, 501 U.S. at 753 (holding that a federal habeas court is barred from reviewing a claim rejected by a state court if the state court's decision rested on a state-law ground that is independent of the federal question and adequate to support the judgment)).

In an attempt to overcome procedural default, Mr. Smith asserts a novel adequacy argument; alternatively, he argues that *Martinez* applies. He cannot demonstrate that the Court's failure to consider his claims would result in a fundamental miscarriage of justice. "To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence." *Schlup v. Delo*, 513 U.S. 298, 321 (1995). Mr. Smith has never asserted his innocence; nor is that plausible, given the evidence against him.

### 3.    *Martinez*

Because there is no constitutional right to an attorney in state postconviction proceedings, *Coleman*, 501 U.S. at 752, bringing a claim without an attorney is not usually deemed cause to excuse procedural default. *Franklin*, 879 F.3d at 313. The

United States Supreme Court, however, has carved out a limited exception. See *Martinez*, 566 U.S. 1.

If a State requires defendants to bring claims of trial counsel's ineffective performance at initial-review collateral proceedings, as does Arkansas, procedural default will not bar a federal habeas court from hearing a *substantial* claim that trial counsel was ineffective if the petitioner was not represented by counsel at the initial-review proceeding or if counsel in that proceeding was ineffective. *Martinez*, 566 U.S. at 17. A claim is considered "substantial" only if a petitioner can demonstrate that it has merit. *Martinez*, 566 U.S. at 16, see also *Slocum v. Kelley*, 854 F.3d 524, 531 (8th Cir. 2017).

The *Martinez* exception applies only to claims for ineffective assistance of *trial* counsel; and the Supreme Court has, so far, rejected invitations to expand it. See *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017); *Dansby v. Hobbs*, 766 F.3d 809, 833 (8th Cir. 2014), *cert. denied sub. nom*, *Dansby v. Kelley*, 136 S. Ct. 297 (Oct. 5, 2015) (refusing to expand exception to claims of ineffective assistance of appellate counsel). Moreover, this district repeatedly declined to apply *Martinez* to petitioners who failed to initiate Rule 37 relief. See *e.g.*, *Trotter v. Payne*, No. 5:19-CV-187-JM-BD, 2019 WL 4621661, at *3 (E.D. Ark. Sept. 3, 2019), *report and recommendation adopted*, 2019 WL 4621971 (E.D. Ark. Sept. 23, 2019); *Phillips v. Kelley*, No. 5:16-CV-92-JM-JTK, 2018 WL 6981226, at *3 (E.D. Ark. Dec. 11, 2018), *report and recommendation adopted*, 2019 WL 138165 (E.D. Ark. Jan. 8, 2019); *Travis v. Kelley*, No. 5:17-CV-44-SWW-JTR, 2017 WL 4295258, at *5 n.15 (E.D. Ark. Sept. 5, 2017), *report and recommendation adopted*, 2017 WL 4295197 (E.D. Ark. Sept. 27, 2017), *appeal dismissed*, No. 17-3471, 2018 WL

2222602 (8th Cir. Apr. 13, 2018), *reh'g denied* (May 16, 2018); *Willis v. Kelley*, No. 5:16-CV-5101, 2017 WL 906979, at *4 (W.D. Ark. Feb. 17, 2017), *report and recommendation adopted*, 2017 WL 901899 (W.D. Ark. Mar. 7, 2017); *Moore v. Kelley*, No: 5:14-CV-94, 2016 WL 958125 at *4 (E.D. Ark. Feb. 18, 2016), *report and recommendation adopted*, 2016 WL 1020839; *McCullough v. Kelley*, No. 5:15-CV-162, *2, 2016 WL 1039521 (E.D. Ark. Feb. 25, 2016) ("*Martinez* does not apply in this case because Petitioner did not file a Rule 37 petition."), *report and recommendation adopted*, 2016 WL 1047369; *Bland v. Hobbs*, No. 5:11-CV-286, 2012 WL 2389904, at *3 n. 5 (E.D. Ark. June 12, 2012) (failure to file a state postconviction petition prevents application of the *Martinez* exception), *report and recommendation adopted*, 2012 WL 2874118 (E.D. Ark. July 13, 2012).

In *Coleman*, the United States Supreme Court squarely held that there is no constitutional right to postconviction counsel. *Coleman*, 501 U.S. at 752. After acknowledging that holding, the Supreme Court carved out a narrow exception in *Martinez*:

> The rules for when a prisoner may establish cause to excuse a procedural default are elaborated in the exercise of the Court's discretion. These rules reflect an equitable judgment that only where a prisoner is **impeded or obstructed** in complying with the State's established procedures will a federal habeas court excuse the prisoner from the usual sanction of default.

*Martinez*, 566 U.S. at 13 (internal citations omitted). The Supreme Court reiterated the narrow application of *Martinez* in *Davila*, 137 S. Ct. 2058:

> *Martinez* made clear that "[t]he rule of *Coleman* governs." Applying *Martinez's* highly circumscribed, equitable exception to new categories of procedurally defaulted claims would thus do precisely what this Court

disclaimed in *Martinez*:  Replace the rule of *Coleman* with the exception of
*Martinez*.

*Id.* at 2066 (internal citations omitted).

        4.      Analysis

Director Payne contends that the equitable principles underpinning the *Martinez*
decision excuses default only where a State failed to appoint counsel after a petitioner
properly initiated collateral review. In short, he argues that, because *Coleman* remains
controlling precedent, a petitioner such as Mr. Smith, who did not effectively initiate a
collateral-review proceeding (Rule 37 in Arkansas), can find no refuge in *Martinez*.

 Unquestionably, all of Mr. Smith's ineffective-assistance claims are procedurally
defaulted because he failed to properly initiate his Rule 37 action. See *Smith*, 2015 Ark.
23, at 2 (Arkansas Supreme Court affirming dismissal of the Rule 37 petition). Mr.
Smith, nonetheless, argues that he has cause for his default. Despite having litigated this
case since 2016, Mr. Smith waited until his reply to a response to his second amended
petition to challenge the adequacy of the Arkansas procedural rules in Rule 37
postconviction proceedings. (#73 at 2-8)

Mr. Smith's reliance on pre-AEDPA[15] federal cases and allegations of inconsistent
application of the Rule 37 procedural rules by the Arkansas Supreme Court and Arkansas
Court of Appeals (*Id*. at 3-8) is not persuasive. He argues that the procedural grounds for
rejecting Rule 37 relief in Arkansas are inadequate to bar federal habeas review because
procedural rules are not "firmly established" and are "inconsistently followed." (*Id*. at 4)

---

[15] Antiterrorism and Effective Death Penalty Act.

This argument was never presented to the state courts, and this Court should not engage in a *de novo* review of the adequacy of state procedural rules at this stage of litigation.

Clearly, if Mr. Smith had not filed a Rule 37 petition at all, he would not be entitled to either equitable tolling of the statute of limitations or relief under *Martinez.* Likewise, he would not be entitled to equitable tolling of the statute of limitations if he had filed a *flawed* Rule 37 petition. Therefore, his flawed Rule 37 petition bars him from passing through the narrow *Martinez* window. In sum, *Martinez* does not extend to the facts here because Mr. Smith did not properly initiate state postconviction proceedings. The Court finds no cause, therefore, to excuse his procedural default of ineffective-assistance-of-counsel claims.

### 5.   Alternative Ruling

Even if *Martinez* were available to Mr. Smith, he would not prevail. To prove that his ineffective-assistance claims are substantial, Mr. Smith must show that Mr. Hogue was deficient and that he suffered prejudice as a result of this deficient performance. See *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). To prove deficient performance, Mr. Smith "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To establish prejudice, Mr. Smith "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "To satisfy *Strickland*, the likelihood of a different result must be 'substantial, not just conceivable.'" *Slocum*, 854 F.3d at 532 (citations omitted). As explained below, none of Mr. Smith's ineffective-

assistance claims are substantial and cannot support cause to excuse his procedural default.

B.    Failure to object to trial court's use of the stun belt

In his first ineffective-assistance claim, Mr. Smith faults Mr. Hogue for failing to object to Judge's Karren's decision to require him to wear a stun belt. Mr. Smith concludes that he was forced to "waive his fundamental right to a jury trial" as a result of Mr. Hogue's failure to object to the use of a stun belt.

By all accounts, Mr. Hogue did not act as an effective advocate for Mr. Smith when he did not object to Judge Karren's decision to have Mr. Smith go to trial wearing a stun belt without a hearing and without stating his reasons on the record. The error is glaring given that federal caselaw and the Arkansas criminal rules for shackling defendants require as much. The Court will credit Mr. Smith with demonstrating that Mr. Hogue was constitutionally deficient for failing to object to the stun belt and for failing to make a record. Nevertheless, Mr. Smith cannot demonstrate that he was prejudiced as a result of Mr. Hogue's failure in this regard.

The weight of the evidence against Mr. Smith was overwhelming; but just as important, under his plea agreement, he avoided the real potential of a life sentence. His acceptance of a 40-year sentence with the possibility of parole was an objectively intelligent choice, given the evidence and the multiple serious felony charges he faced. Mr. Smith cannot demonstrate *Strickland* prejudice, even if he were able to establish cause under *Martinez*. His claim would not be deemed substantial under *Martinez* and would, therefore, be deemed procedurally defaulted in any event.

42

C.    Advice to Plead Guilty Despite a Meritorious Speedy-Trial Defense

Mr. Smith claims that Mr. Hogue was ineffective for advising him to plead guilty despite having a meritorious speedy-trial claim. He maintains that Mr. Hogue told him that a motion to dismiss for violation of the state speedy-trial rule would be denied and that it was in his best interest to plead guilty. (#34-1 at 24) Not only is this claim procedurally defaulted, but Mr. Smith admits that, by pleading guilty, he waived his right to a speedy trial. (#34-1 at 32) "A voluntary plea of guilty constitutes a waiver of all non-jurisdictional defects[,] ... [and] the right to a speedy trial is non-jurisdictional in nature." *United States v. Seay*, 620 F.3d 919, 922 (8th Cir. 2010), *cert. denied*, 562 U.S. 1191 (2011) (quoting *Becker v. Nebraska*, 435 F.2d 157 (8th Cir. 1970), *cert. denied*, 402 U.S. 981 (1971)). Nevertheless, Mr. Smith contends that his guilty plea did not operate as a waiver of an ineffective-assistance-of-counsel claim based on the same. The claim remains procedurally defaulted, however, and subject to a *Strickland* and *Martinez* review.

It is true that more than five years passed from the time Mr. Smith was charged until the day his jury trial began. Mr. Smith outlines the many continuances and time-exclusions in the record and admits that he was tried within the state's twelve-month speedy-trial requirement. (#34-1 at 29). He argues, however, that some of the delays would not have been deemed excludable had his lawyer raised a challenge. This assertion is not supported by the record.

Relying on state law, Mr. Smith argues that "none of the delay that occurred in this case as a result of his then-retained counsel John VanWinkle's withdrawal" should

have been attributed to him. (#34-1 at 29) In support, he cites *Glover v. State*, 307 Ark. 1 (1991). The facts in *Glover*, however, were quite different from those in Mr. Smith's case. Not only did Glover's counsel withdraw without his knowledge, but also, the trial date was set without his knowledge. *Id.* at 3. In contrast, Mr. Smith was present when Mr. VanWinkle withdrew; he was immediately given new counsel; and Mr. VanWinkle withdrew for good cause – because he discovered he had previously represented one of the confidential informants. (#40-2 at 108, #40-3 at 313-16) Thus, the trial judged appointed new defense counsel for good cause, and any resulting delay was properly excluded from the speedy-trial clock. *Glover*, 307 Ark. at 3; see also *Nelson v. United States*, 97 F. Supp. 3d 1131, 1162 (W.D. Mo. 2015), *aff'd*, 909 F.3d 964 (8th Cir. 2018) (citing *Gray v. Bowersox*, 281 F.3d 749, 756 n.3 (8th Cir. 2002)) ("Ineffective assistance claims cannot be based on counsel's alleged failure to raise a meritless argument"). In sum, Mr. VanWinkle's withdrawal would not have given Mr. Hogue reason to raise a speedy-trial challenge on Mr. Smith's behalf.

Mr. Smith also cites *Barker v. Wingo*, 407 U.S. 514 (1972) in support of his claim that Mr. Hogue should have raised a speedy-trial challenge. In *Barker*, the Supreme Court determined that a speedy trial violation can be demonstrated by the length of the delay; the reason for the delay, if the right was asserted; and prejudice to the defendant. *Id.* at 530-32.

Mr. Smith admits that he was tried within Arkansas's twelve-month statutory requirement. In any event, the delays were due, in large part, to Mr. Smith's acrimonious relationship with several of his lawyers. Mr. Smith spoke with the trial court on many

occasions but never once asserted speedy trial concerns. Rather, many of his conversations with the court concerned his displeasure with counsel and challenges to the validity of search and arrest warrants.

Finally, Mr. Smith attempts to demonstrate prejudice by asserting that, had his lawyer raised a speedy trial issue, he would likely have gone to trial sooner. As a result, he contends that he would have gone to trial sooner and that a different judge would have presided who would not have required him to wear a stun belt.

Mr. Smith has not demonstrated that Mr. Hogue was deficient for failing to make a non-meritorious motion to dismiss for denial of a speedy trial. Likewise, he has not demonstrated that Mr. Hogue's decision to not raise a speedy-trial issue caused prejudice. His but-for argument that a different judge might have presided and might not have required him to wear a stun belt is speculative and in no way demonstrates prejudice. See *Estes v. United States*, 883 F.2d 645, 647 (8th Cir. 1989) (holding that conclusory allegations are insufficient to support a claim for ineffective assistance of counsel). Because Mr. Smith cannot demonstrate a likelihood of success, this claim cannot be considered substantial so as to overcome procedural default.

D.    Failure to Litigate the Legality of Search and Arrest Warrants

Mr. Smith next maintains that his guilty plea is invalid because Mr. Hogue failed to challenge the veracity of the affidavits supporting the search and arrest warrants or the validity of the warrants themselves. While Mr. Smith was represented by Jannette McKinney, the court held a suppression hearing. (#40-3 at 155-170). At that hearing, Judge Tommy Keith testified that he had personally reviewed the search and arrest

warrants and had approved both. (*Id*.) Judge Karren denied the motion to suppress after finding Judge Keith's testimony credible and finding that the warrants and the supporting affidavits were valid. (*Id*. at 166-67)

Mr. Hogue's decision not to refile a motion to suppress after Judge Karren had denied relief cannot reasonably be questioned. (#69 at 40); see *Gray*, 281 F.3d at 756 n.3. Mr. Smith's dissatisfaction with the results of the suppression hearing does not invalidate his guilty plea; nor does it amount to a substantial claim to excuse his procedural default.

E.    Failure to Raise Evidentiary Issues

In his final ineffective-assistance-of-counsel argument, Mr. Smith asserts that he did not knowingly enter his guilty plea. He argues that he pleaded guilty only because Mr. Hogue failed to raise a *Brady* challenge to the State's handling of the evidence. See *Brady v. Maryland*, 373 U.S. 83 (1963). Mr. Smith alleges that the State tampered with, and possibly destroyed, evidence. In support of this argument, he points to the weight of the illegal drugs described in the affidavit in support of the arrest warrant as compared with the weight of the drugs in trial testimony. He also claims that the State withheld documents showing that the chain of custody of the evidence was broken. Mr. Smith takes issue with the fact that, rather than moving to suppress the evidence or to objecting to its introduction at trial, his counsel stipulated to its chain of custody.

As discussed, the validity of the search and arrest warrants was tested and upheld by the trial court. At the suppression hearing, Mr. Smith's lawyer explained to the trial court that Mr. Smith wanted her to make a foundational challenge to the evidence but

that, for strategic reasons, she preferred to challenge some of the issues at trial. (#40-3 at 115-116)

Mr. Hogue made a different decision as the case progressed and during trial, but that does not mean that his decision was deficient. Mr. Hogue might well have planned to intensively cross-examine the detective or other witnesses, but because Mr. Smith opted to change his plea, the issue was abandoned. Again, Mr. Smith's dissatisfaction with trial counsels' strategic decisions does not amount to ineffective assistance of counsel. Further, Mr. Smith cannot demonstrate any resultant prejudice. Thus, this claim is not substantial and cannot support cause for the procedural default of this claim.

## VI.    Mr. Hogue's Alleged Conflict of Interest

### A.    Background

At the federal evidentiary hearing, Mr. Smith learned for the first time that Mr. Hogue had met with the prosecutors and Judge Karren outside of his presence to report that Mr. Smith had threatened him. (#69 at 16-19, 37) It was at this meeting that Judge Karren announced to the lawyers that he intended to have Mr. Smith wear a stun belt during trial. Only later did Judge Karren explain his reasons: Mr. Smith had repeatedly come to court in an agitated state; Judge Karren was concerned both about the legitimacy of the threat to Mr. Hogue and that Mr. Smith might attempt to cause a mistrial; and, Judge Karren was concerned about Mr. Smith's capacity for violence given his recent arrest for aggravated robbery that required the local SWAT team to extricate him from his home, where his girlfriend and her young son were present. (#69 at 129-31, 161)

Judge Karren was adamant that he would have had Mr. Smith wear a stun belt even had he never learned about the additional threats to Mr. Hogue. (*Id.* at 134)

After the federal evidentiary hearing, Mr. Smith was granted permission to file a second amended petition to add a claim that his guilty plea should be set aside as a result of constitutionally conflicted counsel. (#69 at 37, #65, #66) He contends that Mr. Hogue had, at the very least, "impliedly request[ed]" that Mr. Smith be restrained in a stun belt—evidence, he argues, of Mr. Hogue's divided loyalty and a violation of Mr. Smith's right to conflict-free counsel. Director Payne contends that this claim, too, is procedurally defaulted and meritless in any event. (#72)

B.     Procedural Default

Again, a habeas petitioner's default can be excused only if he can demonstrate either cause for the default and actual prejudice flowing from the alleged violation of federal law, or that a fundamental miscarriage of justice is at stake. *Franklin*, 879 F.3d at 311. Cause is established when some objective factor external to the defense impeded efforts to comply with the state's procedural rule. *Id.* at 313.

As with his other claims, Mr. Smith argues that his conflict-of-counsel claim is not procedurally defaulted because Arkansas's Rule 37 procedure neither provides an adequate nor an independent ground for review. (#73) Mr. Smith further contends that he essentially was "duped" into believing that Mr. Hogue had his best interests in mind when he urged him to plead guilty. (*Id.* at 17)

Mr. Smith emphasizes that he did not know, and could not have known, that Mr. Hogue was afraid of him until the federal evidentiary hearing. He argues that this is

evidence that "officials made compliance with the state's procedural rule impracticable." (#73 at 17) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986) & *Smith v. Murray*, 477 U.S. 527, 538 (1986)). Thus, he argues, he could not have timely raised the claim in a Rule 37 petition because the facts underlying the claim were hidden from him. Finally, he contends, even if this claim is procedurally defaulted, it should be excused under *Martinez*.

The Court has already rejected Mr. Smith's adequacy and *Martinez* arguments, *supra*, and will not repeat that discussion here. *Martinez*, 566 U.S. at 17. Further, even if *Martinez* applied, Mr. Smith cannot demonstrate that his claim is substantial. Even accepting that the facts underlying this claim appear to have been hidden from Mr. Smith,[16] Mr. Smith still cannot demonstrate that Mr. Hogue was actually conflicted or that he was prejudiced as a result. Therefore, he cannot overcome the procedural default of this claim.

C.    Conflicted Counsel

If counsel had an actual conflict, and if the conflict adversely affected counsel's performance, prejudice is presumed. *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). Additionally, when considering a conflict in the context of a guilty plea, the appropriate question is whether the conflict "adversely affected the voluntary nature of the guilty plea entered." *Berry v. United States*, 293 F.3d 501, 503 (8th Cir. 2002) (quoting *Thomas v.*

---

[16] Mr. Smith's counsel raised the issue of the threat during the direct examination of Mr. Hogue at the federal evidentiary hearing. (#69 at 16) Thus, despite Mr. Smith's assertions that he did not know of the threat prior to the hearing, his federal habeas counsel questioned Mr. Hogue extensively about the alleged threat.

*Foltz*, 818 F.2d 476, 480 (6th Cir. 1987), *cert. denied*, 484 U.S. 870). "An 'actual

conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects

counsel's performance." *Kiley v. United States*, 914 F.3d 1142, 1145 (8th Cir. 2019)

(quoting *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002)).

      D.    Analysis

      Mr. Smith cannot demonstrate that Mr. Hogue was conflicted or, even if he was,

that the conflict affected his representation or led Mr. Smith to involuntarily plead guilty.

Mr. Smith insists that he never threatened Mr. Hogue; nevertheless, it was clear from Mr.

Hogue's testimony at the evidentiary hearing that he felt threatened by Mr. Smith. A

threat, standing alone however, does not establish a conflict.

      A criminal defendant is not entitled to an attorney who likes and feels comfortable

with him. See *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983) (no right to "a meaningful

attorney-client relationship" or "rapport"); *United States v. Swinney*, 970 F.2d 494, 499

(8th Cir. 1992). "A lawyer can effectively represent a client [he] fears and dislikes; that

has always been part of a lawyer's calling, necessary to preserving justice for all." *United

States v. Keys*, 67 F.3d 801, 808 (9th Cir. 1995); *on reh'g en banc*, 95 F.3d 874 (9th Cir.

1996), *cert. granted*, *judgment vacated*, 520 U.S. 1226 (1997).

      Again, both Judge Karren and the prosecuting attorney, Mr. Cearley, testified that

they never considered Mr. Hogue conflicted as a result of the in-chambers conversation

about the alleged threat. Mr. Hogue agreed and insisted that the threat had no impact on

his representation. (#69 at 21-22, 68, 157, 176) Mr. Hogue testified that Mr. Smith had

rejected all plea offers and planned to proceed to trial. (#40-9 at 2-3) Mr. Hogue was

prepared, therefore, to try the case. The trial began; the jury was empaneled; and the lawyers made their opening statements. It was only then that Mr. Smith, not Mr. Hogue, questioned whether a plea deal was still on the table. (#69 at 105)

At the first recess, Mr. Smith, Mr. Hogue, and Mr. Cearley began plea negotiations. Mr. Cearley testified that Mr. Smith returned to the courtroom after the recess, shrugged his shoulders to his family and friends in the gallery and said, almost sheepishly, "What can I say? They talked me into a plea deal." (#69 at 169) Mr. Cearley testified that he specifically recalled Mr. Smith's explanation to his family because it was contrary to the fact that it was Mr. Smith who initiated the final plea negotiations; and no one had pressured him to consider taking a plea at that point in the trial. (*Id.*)

Mr. Smith stood before the court, heard the evidence the state would produce against him, and freely admitted guilt to each crime. There is no question that he understood the charges, the weight of the evidence, and the benefit of the negotiated sentence, in contrast to the life sentence the jury could have imposed.

The in-chambers off-the-record conversation where Mr. Hogue reported Mr. Smith's threat should never have happened. That said, that incident, however improper, did not render Mr. Hogue constitutionally conflicted. Significantly, there is no evidence that Mr. Smith's plea was involuntary or unreasonable in light of the facts and possible life sentence.

## VII.   <u>Summary</u>:

This case is both complex and simple—complex because of the number of attorneys and judges involved, the time elapsed before trial, Mr. Smith's long-held

insistence that the search and arrest warrants were unconstitutional, and his attempts to obtain postconviction relief that were frustrated by what non-lawyers (and in all honesty, many lawyers) find quirky procedural rules that seem unfair. Because Mr. Smith continued to hit barriers, he may well feel that he was bound by a Gordian Knot of procedural dead ends tightened by pretrial tactical decisions and inadvertent postconviction procedural mistakes.

The case is simple because any dissatisfaction that Mr. Smith may have with decisions his lawyers and the trial judge made is counterbalanced by the sheer weight of the State's evidence against him. There is virtually no doubt as to Mr. Smith's guilt. As a result, Mr. Smith cannot demonstrate prejudice. He has never challenged the weight of the evidence of his guilt for the three controlled buys or for the possession of the drugs and firearms found in his home. He faced 10 to 40 years or life imprisonment on each count, a mandatory additional term for possessing a firearm during the commission of a felony, and the risk of being tried as a habitual offender. The jury could have imposed a life sentence or "stacked" the sentences, which would have effectively resulted in a life sentence.

The dictates of federal evidentiary procedure mandate a finding that Mr. Smith's claims are procedurally defaulted, and that he cannot overcome the default. Further, as explained, even were the claims not defaulted, they lack substance.

## VIII.  <u>Certificate of Appealability</u>:

When entering a final order adverse to a petitioner, the Court must issue or deny a certificate of appealability. Rule 11 of the Rules Governing Section 2254 Cases in the

United States District Court. The Court can issue a certificate of appealability only if Mr. Smith has made a substantial showing that he was denied a constitutional right. 28 U.S.C. § 2253(c)(1)-(2). In this case, Mr. Smith has not provided a basis for this Court to issue a certificate of appealability. Accordingly, a certificate of appealability should be denied on the remaining claims.

IX.    **Conclusion:**

Mr. Smith's claim decided on the merits by the Arkansas Supreme Court is due deference. The remaining claims are procedurally defaulted. Alternatively, his claims lack merit. Accordingly, the Court recommends that his petitions for writ of habeas corpus (#2, #34-1, #66) be DISMISSED, with prejudice. Mr. Smith's pending request for oral argument (#75) should be DENIED, as moot.

DATED this 23rd day of January, 2020.

_____
UNITED STATES MAGISTRATE JUDGE